UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

LESLIE MARIA MEILLEUR,

                              Plaintiff,

             -against-

CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

                              Defendant.

15cv3744 (RJS) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE RICHARD J. SULLIVAN, U.S.D.J.:**

In this action, *pro se* plaintiff Leslie M. Meilleur ("Plaintiff") seeks review of the final

decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Defendant"

or the "Commissioner"), denying Plaintiff Supplemental Security Income ("SSI") benefits under

the Social Security Act (the "Act"), on the ground that Plaintiff's impairments did not constitute

a disability for the purposes of the Act.  Currently before this Court for a report and

recommendation are Defendant's motion, pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, for judgment on the pleadings affirming the Commissioner's decision and dismissing

the Complaint (Dkt. 17), and Plaintiff's opposition to Defendant's motion (Dkt. 20), which, as

discussed below, this Court construes as a cross-motion for judgment on the pleadings in her

favor.

For the reasons set forth below, I respectfully recommend that Defendant's motion for

judgment on the pleadings be denied, that Plaintiff's cross-motion for judgment on the pleadings

be granted, and that the case be remanded for further proceedings.

## BACKGROUND[1]

Plaintiff filed an application for SSI on July 5, 2012 (R. at 98-107), alleging that she became disabled as of March 15, 2009 (*id.* at 98, 129), as a result of an anxiety disorder, an adjustment disorder, and post-traumatic stress disorder ("PTSD") (*id.* at 28, 44).  Plaintiff's current challenge to the denial of her claim focuses on whether the ALJ properly determined that these mental impairments did not significantly limit her ability to perform work-related activities.

### A.    Plaintiff's Personal and Employment History

Plaintiff was born on February 27, 1961, and was 51 years old at the time she filed her application.  (*See id.* at 98, 124, 127.)  She lives in New York City with her husband.  (*Id.* at 99, 128, 142.)  According to her hearing testimony and disability reports that she filed with the Social Security Administration ("SSA"), Plaintiff, who had a college education, worked as a foster-care case worker in 1994 and 1995, and again from 1997 until she lost her job in or about 2002.[2]  (*Id.* at 43-44, 129-31, 135-39, 170, 188.)  Plaintiff remained unemployed from the time that she stopped working as a foster-care case worker until the date of her application for benefits (*id.* at 43-44), but she claimed that she was subjected to a false arrest in 2009, giving rise to the mental health conditions that allegedly caused her to become unable to work (*id.* at 44-45).

---

[1] The background facts set forth herein are taken from the Social Security Administration Administrative Record (Dkt.16), (referred to herein as "R." or the "Record"), which includes, *inter alia*, Plaintiff's medical records and the transcript of a September 12, 2013 hearing held before Administrative Law Judge ("ALJ") Mark Hecht, at which Plaintiff testified.

[2] There is a discrepancy between Plaintiff's disability report form and her testimony from the hearing before the ALJ regarding the year she stopped working.  Although Plaintiff reported in her disability report form that she stopped working in 2001 (R. at 130, 135), she testified before the ALJ that she stopped working in 2002 (*id.* at 43).

### B.   **Medical Evidence**

The relevant medical evidence of record consists of treatment records and other

information submitted by Plaintiff's treating sources, as well as a psychiatric evaluation

conducted by a consulting psychologist.  Although Plaintiff reported that her disability began on

March 15, 2009, the relevant period under review runs from July 5, 2012, the date that Plaintiff

applied for SSI, through September 26, 2013, the date of the ALJ's decision.  *See Frye v. Astrue*,

485 F. App'x 484, 485 n.1 (2d Cir. 2012) (noting that, for purposes of an application for

SSI benefits, a claimant must show that she was disabled between the time her application was

filed and the time of the Commissioner's final decision).

### 1.   **Treating Sources**

#### a.   **Harlem Hospital Center**

On August 27, 2010, Plaintiff visited Harlem Hospital Center complaining of

nervousness and seeking a referral to a therapist.  (R. at 206-07.)  Dr. Nurur Rahman diagnosed

Plaintiff with an adjustment disorder[3] with depressed mood and referred her to a psychiatry

clinic.  (*Id*. at 206.)  During both a physical examination in September of 2011 and a

gynecological examination in October of 2011, Plaintiff reported that she had anxiety,

depression, and PTSD, but denied having a depressed mood, nervousness, or sleep disturbance,

and displayed no evidence of a thought disorder.  (*Id*. at 194, 203-04.)  Plaintiff apparently

attended several sessions of group therapy at Harlem Hospital, but she soon asked to be treated

---

[3] An adjustment disorder is "any of a group of psychological disorders characterized by
emotional or behavioral symptoms that occur in response to a specific stressor ([such] as divorce
or unemployment) and are either excessive or impair social or occupational functioning and
relationships."  http://www.merriam-webster.com/medical/adjustmentdisorder (last visited
Aug. 19, 2016).

with individual therapy, as she did not feel comfortable in a group setting.  (*Id*. at 47, 238.)  The Record does not contain any documents relating to Plaintiff's treatment in group therapy.

### b.   Metropolitan Center for Mental Health

#### i.   Initial Assessment

On February 3, 2011, Doctoral Candidate Adrian Cox ("Cox") performed an initial intake assessment of Plaintiff at Metropolitan Center for Mental Health ("MCMH"), under the supervision of Cynthia Budick, Ph.D.  (*See id*. at 237-40.)  During that assessment, Plaintiff reported that she had been feeling depressed for about two years, that she would sometimes cry when she was alone, and that she was having difficulty sleeping.  (*Id*. at 237-38.)  Plaintiff explained that these feelings began in 2009, after she was "traumatized" by a false arrest.  (*Id*. at 238.)  Cox noted that, after the incident, in addition to having feelings of depression, Plaintiff also developed fears of police cars and of being handcuffed and fingerprinted, and she began to have nightmares at least once per week.  (*Id*.)

Cox further recorded that Plaintiff was oriented and alert during the assessment, and that she did not display any memory impairments.  (*Id*. at 239.)  Cox also observed that Plaintiff displayed appropriate affect and some insight into her illness, and that her speech and thought processes were normal, but that her judgment and impulse control were questionable.  (*Id*.)  Using the multiaxial method of assessment,[4] either Cox or Dr. Budick:  on Axis I, diagnosed

---

[4] The multiaxial system of assessment "involves an assessment on several axes, each of which refers to a different domain of information."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 27 (4th ed. rev. 2000) ("DSM-IV"). Axis I refers to clinical disorders and other conditions that may be the focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions that may be relevant to the understanding or management of the individual's mental disorder; Axis IV refers to psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders; and Axis V refers to Global Assessment of Functioning ("GAF").  *Id.*

Plaintiff with dysthymic disorder,[5] and noted that further consideration was needed to rule out PTSD;[6] on Axis II, deferred a diagnosis; on Axis III, noted that Plaintiff reported no other medical conditions relevant to her mental disorder; on Axis IV, reported that Plaintiff was "unemployed;" and, on Axis V, recorded that Plaintiff's GAF was 65.[7]  (*Id*. at 240.)  Based on this assessment, Plaintiff was deemed an appropriate candidate for weekly outpatient psychotherapy.  (*Id*.)

### ii.      Individual Therapy at MCMH

In March 2011, Dr. Rebecca Cohen, a psychologist at MCMH, completed an initial treatment plan for Plaintiff.  (*See id*. at 241-43.)  Dr. Cohen noted that Plaintiff presented with depressive symptoms related to a traumatic event, diagnosed Plaintiff with an adjustment disorder with depressed mood, and recorded that Plaintiff had a GAF score of 65.  (*Id*. at 243.)  Dr. Cohen recommended individual weekly treatment, but prescribed no medication.  (*Id*. at 242.)

---

[5] Dysthymic disorder is "a mood disorder characterized by chronic mildly depressed or irritable mood[,] often accompanied by other symptoms ([such] as eating and sleeping disturbances, fatigue, and poor self-esteem)."  http://www.merriam-webster.com/dictionary/dysthymia (last visited Aug. 19, 2016).

[6] Post-traumatic stress disorder is "a mental condition that can affect a person who has had a very shocking or difficult experience (such as fighting in a war) and that is usually characterized by depression, anxiety, etc."  http://www.merriam-webster.com/dictionary/post-traumaticstressdisorder (last visited Aug. 19, 2016).

[7] The GAF scale, ranging from 0 to 100, may be used to report a clinician's judgment of an individual's overall level of functioning.  *See* DSM-IV at 32.  A GAF of 61 to 70 represents "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.* at 34.  The most recent (2013) edition of the DSM, however, "has dropped the use of the [GAF] scale."  *Restuccia v. Colvin*, No. 13cv3294 (RMB), 2014 WL 4739318, at *8 (S.D.N.Y. Sept. 22, 2014) (quoting *Mainella v. Colvin*, No. 13cv2453 (JG), 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014)).

On November 28, 2011, Dr. Cohen completed a treating physician's wellness plan report in which she listed Plaintiff's diagnosis as an adjustment disorder with depressed mood.  (*Id.* at 219-20.)  In that report, Dr. Cohen also recorded that Plaintiff had an anxious mood, but an appropriate affect, good judgment, and no hallucinations or delusions.  (*Id.*)  Dr. Cohen further noted that Plaintiff continued to experience symptoms, but that Plaintiff believed therapy was helpful and that she would become "more stable" with continued treatment.  (*Id.* at 221-22.)  In describing Plaintiff's "functional capacity," Dr. Cohen opined that, at the time of her report, Plaintiff was "temporarily unemployable," but that in several months – by about March 2012 – she would be able to work without any limitations.  (*Id.*)  Dr. Cohen conducted reviews of this treatment plan in December of 2011 and March of 2012, noting that Plaintiff still presented with depressive symptoms and making no changes to Plaintiff's treatment plan.  (*Id.* at 223-26.)

On May 23, 2012, Dr. Cohen completed a form titled "Medical Report for Claim of Disability and Exemption From Work Experience Program."  (*See id.* at 228-32.)  On that form, Dr. Cohen listed Plaintiff's diagnosis as an adjustment disorder with depressed mood and explained that Plaintiff's condition was expected to last at least several months.  (*Id.* at 228.)  With respect to Plaintiff's depressive and anxiety symptoms, Dr. Cohen stated that Plaintiff was experiencing "sad mood, difficulty eating, difficulty concentrating, nervousness, bad dreams, stomach upset, [and] headaches," which all began following her March 2009 arrest.  (*Id.*)  Dr. Cohen noted that Plaintiff attended weekly individual psychotherapy sessions to manage her symptoms and opined that, with continued treatment, Plaintiff would "be able to maintain employment at some point in the future."  (*Id.* at 229.)  Additionally, Dr. Cohen noted that Plaintiff did not take any medication for her condition, and that Plaintiff's symptoms would not

interfere with her ability to attend work on a regular basis or commute daily by public transportation.  (*Id*. at 231.)

On June 14, 2012, Dr. Cohen completed a treatment plan review, in which she reported that Plaintiff was diagnosed with an adjustment disorder with depressed mood and that Plaintiff's GAF score was 65.  (*Id*. at 244-47.)  Dr. Cohen further reported that Plaintiff had made some progress in her treatment but continued to experience depressive symptoms.  (*Id*. at 245.) Dr. Cohen completed another treatment plan review on March 16, 2013, in which Plaintiff's recorded diagnosis, symptoms, and GAF remained unchanged.  (*Id*. at 174-77.)[8]

On July 2, 2013, Darwin Abreu, a Licensed Clinical Social Worker at MCMH, wrote a letter on behalf of Plaintiff, stating that Plaintiff's previous therapist (presumably Dr. Cohen) had left MCMH, and that Plaintiff was being readmitted for mental health services after a temporary cessation in treatment.  (*Id*. at 250.)  Abreu noted that, during a June 20, 2013 assessment interview, Plaintiff had been diagnosed with PTSD and generalized anxiety disorder, and that she was currently on a wait list to be assigned for weekly psychotherapy treatment.  (*Id*.)

After being readmitted to MCMH, Plaintiff began receiving treatment from Licensed Master Social Worker Laura Gargana ("Gargana").  In an initial treatment plan conducted in July 2013, Gargana stated that Plaintiff's diagnoses were PTSD and generalized anxiety disorder, and that Plaintiff's GAF score was 65.  (*Id*. at 253.)  On January 21, 2014 – after the ALJ had issued a decision on Plaintiff's claim for SSI benefits – Gargana completed a treatment plan review which indicated that Plaintiff had showed no progress toward her treatment goal because she had not "been engaged in treatment long enough to show progress."  (*Id.* at 18.)  In that treatment plan review, Gargana noted that Plaintiff presented with anxiety, depression, and

---

[8] The March 2013 treatment plan review is duplicated in R. at 254-57.

difficulty sleeping, and she diagnosed Plaintiff with generalized anxiety disorder and PTSD. (*Id*. at 19.)

iii.       **Letters Regarding Employment-Related Limitations**

During the course of Plaintiff's treatment, Dr. Cohen and Gargana wrote several letters setting forth their opinions that Plaintiff's psychological conditions resulted in limitations with respect to her ability to maintain stable employment.  On January 18, 2012, Dr. Cohen wrote the first of these letters, which was addressed "To Whom it May Concern," and stated that Plaintiff received weekly psychotherapy at MCMH for an adjustment disorder with depressed mood, which resulted in "depressive and anxiety symptoms," and that Plaintiff was unable to maintain steady employment as a result.  (*Id*. at 216-18, 227.)  Dr. Cohen wrote a similar letter on March 7, 2012, in which she stated that Plaintiff would still have difficulty maintaining steady employment due to symptoms caused by an adjustment disorder with depressed mood, which included "sad mood, difficulty eating, difficulty concentrating, nervousness, and having bad dreams most nights."  (*Id*. at 217.)  Dr. Cohen later wrote five more nearly identical letters (dated May 9, 2012, June 13, 2012, October 24, 2012, December 12, 2012, and January 30, 2013), opining in each that Plaintiff would still have difficulty attending to tasks and maintaining steady employment, due to symptoms associated with her diagnosis of an adjustment disorder with depressed mood.  (*Id*. at 178-79, 218, 227, 248, 258.)

After Plaintiff ceased receiving treatment from Dr. Cohen and began seeing Gargana, Gargana wrote several more similar letters.  For instance, Gargana wrote a letter on September 9, 2013, stating that Plaintiff was attending weekly psychotherapy sessions to address psychological difficulties resulting from a false arrest in March 2009, and that Plaintiff had been diagnosed with an adjustment disorder with depressed mood.  (*Id*. at 249.)  In that letter, Gargana

8

referenced Dr. Cohen's January 2012 letter; noted Dr. Cohen's opinion, at that time, that Plaintiff was "unable to maintain steady employment"; and stated that she had "no reason to believe [Dr. Cohen's] assessment should be changed, or does not apply."  (*Id.*)  On January 21, 2014, Gargana wrote a letter that was nearly identical to her September 13, 2013 letter.  (*Id*. at 15.)

### c.     FEGS Examination

Plaintiff's mental health was also evaluated in July 2013, by Dr. Zobidatte Moussa, in connection with Plaintiff's physical examination for Federation Employment and Guideline Services ("FEGS").  (*See* R. at 260-74, 276-88, 290-99.)  Dr. Moussa stated that Plaintiff had been diagnosed with PTSD and noted that this condition impacted her employment.  (*Id.* at 287.) Dr. Moussa also noted that Plaintiff had medical limitations to employment that required vocational rehabilitation and/or specialized supports, but that she could participate in 35 hours (presumably per week) of vocational services.  (*Id.*)  Her limitations were nonexertional, and Dr. Moussa recommended that Plaintiff work in a low stress environment.  (*Id.* at 284-85.)

### 2.     Consultative Source

### a.     Psychiatric Examination by Jonathan Belford, Psy. D.

On August 13, 2012, Dr. Jonathan Belford, a consulting psychologist, examined Plaintiff and conducted a mental status examination ("MSE").  (*See id*. at 233-36.)  During Dr. Belford's MSE, Plaintiff reported that she had been the victim of a false arrest in 2009, and that she "suffered from significant emotional distress as a result of that experience."  (*Id*. at 233.) Plaintiff complained of difficulty sleeping, fluctuating weight and appetite, dysphoric mood, and anxiety-related symptoms such as apprehension, worry, irritability, and intrusive thoughts.  (*Id.*) Plaintiff denied experiencing any memory issues, suicidal ideation, symptoms of panic attacks, mania, or thought disorders.  (*Id*. at 233-34.)

According to Dr. Belford's notes, Plaintiff informed him that she had completed four years of college and received a bachelor's degree, and that she had been unemployed since 2002, when her employment as a foster-care case worker was terminated. (*Id*.) Plaintiff also reported that she was able to "dress, bathe, and groom herself independently, cook and prepare food, perform[] general cleaning, do laundry, shop, manage money, drive,[9] and take public transportation by herself," and Dr. Belford noted that Plaintiff had traveled to the evaluation by herself via train. (*Id*. at 233, 235.) Plaintiff further stated that, since her 2009 arrest, most tasks took her longer to accomplish, and it was harder for her to obtain the motivation to complete her daily activities. (*Id*.) Plaintiff informed Dr. Belford that she spent her days reading, cleaning, doing laundry, preparing her false arrest lawsuit, and trying to relax. (*Id*.) Dr. Belford also noted Plaintiff's statement that she was generally a social person who was content with her friendships and maintained sporadic contact with her family members. (*Id*.)

Dr. Belford's notes further reflect that Plaintiff remained cooperative and related in an adequate manner throughout the evaluation. (*Id*. at 234.) In terms of her appearance, Plaintiff was dressed appropriately, was well groomed, and had appropriate behavior and eye contact. (*Id*.) Plaintiff's speech was clear and "demonstrated adequate expressive and receptive language capabilities"; her affect was appropriate; and her insight and judgment seemed fair. (*Id*. at 234-35.) Dr. Belford reported that Plaintiff's thought processes were coherent and goal oriented, and that she exhibited no evidence of hallucinations, delusions, or paranoia. (*Id*.) Dr. Belford also noted, however, that Plaintiff's responses were "somewhat tangential," and that she continuously brought up "her experience of being arrested . . . and the degree to which that was a

---

[9] Plaintiff stated in a function report she submitted to the SSA that she did not have a driver's license, had not learned to drive, and only had a non-drivers identification card. (R. at 145-46.)

traumatizing event." (*Id*.)  Additionally, Dr. Belford opined that Plaintiff's attention, concentration, and recent and remote memory skills "[s]eemed mildly impaired due to anxiety in the evaluation." (*Id*. at 235.)

Dr. Belford determined that Plaintiff could follow and understand simple directions and instructions and was capable of performing tasks independently. (*Id.*)  He expressed the belief that Plaintiff could maintain attention and concentration and was able to maintain a regular schedule. (*Id*.)  Although Dr. Belford further opined that Plaintiff had the ability to learn new tasks, perform complex tasks with supervision, make appropriate decisions, and relate adequately with others, he also concluded that Plaintiff could not appropriately deal with stress due to psychiatric symptoms, anxiety, and possible PTSD. (*Id*. at 235-36.)

Overall, Dr. Belford's diagnosed Plaintiff with anxiety disorder not otherwise specified ("NOS"), and stated that further consideration was needed to rule out PTSD. (*Id*. at 236.)  Although Dr. Belford indicated that his results seemed consistent with psychiatric problems, he believed that Plaintiff's impairments were not severe enough to interfere with her ability to function on a daily basis. (*Id*.)

## C.   <u>Procedural History</u>

### 1.   <u>Plaintiff's Application for Benefits and Initial Denial</u>

Plaintiff applied for SSI benefits on July 5, 2012, alleging that she had become disabled as of March 15, 2009, due to PTSD, depression, and anxiety. (*See id.* at 98-107, 129.)  Her claim was denied on August 24, 2012 (*id.* at 64-68), and, on October 26, 2012, Plaintiff requested a hearing before an ALJ (*id.* at 70-72).

## 2.      <u>Administrative Hearing and Decision Denying Benefits</u>

On September 12, 2013, Plaintiff appeared *pro se* at a hearing before ALJ Hecht, at which only Plaintiff testified.  (*See id.* at 39-52).  In response to the ALJ's questioning regarding her educational and employment history, Plaintiff stated that she had received a high school diploma and completed four years of college.  (*Id.*)  Plaintiff further testified that, in 2002, she lost her job as a foster-care case worker due to her employer's dissatisfaction with her performance in the position.  (*Id.*)  According to Plaintiff, she attempted to find work subsequent to the termination of her employment, but abandoned her job search when her mother came down with Parkinson's disease and "a host" of other health problems.  (*Id.* at 43-44.)  Plaintiff explained that, from that time until 2011, she served as her mother's full-time caretaker.  (*Id.* at 44.)

The ALJ then questioned Plaintiff regarding her alleged medical disabilities of anxiety and PTSD.  (*Id.* at 44.)  Plaintiff testified that these impairments began in 2009, when she was the victim of a false arrest.  (*Id.* at 44-45.)  According to Plaintiff, this false arrest occurred after she had visited a friend, at the apartment of his ex-girlfriend, in order to pick up a DVD.  (*Id.* at 44.)  Unbeknownst to Plaintiff, her friend was then in the apartment unlawfully (as the ex-girlfriend had "kicked him out"), and he was in the process of robbing the premises.  (*Id.* at 44-45.)  When the police learned that Plaintiff had been at the apartment on the day of the robbery, Plaintiff was arrested, placed in a holding cell, and charged with a "bogus charge of trespassing" in an attempt to compel her to testify against her friend.  (*Id.*)  Plaintiff testified that she began suffering from the psychological symptoms described in her application for SSI benefits immediately following her false arrest, and that she started attending group therapy at Harlem Hospital to treat those symptoms on August 27, 2010.  (*Id.* at 47)  Plaintiff further

testified that, starting in 2011, she began seeing a therapist, Dr. Cohen, for one-on-one treatment sessions.  (*Id.* at 47.)  She stated that she had received treatment from Dr. Cohen for about a year and one-half to two years, and that she had been seeing Gargano for therapy since Dr. Cohen "left."  (*Id.* at 48.)  According to Plaintiff's testimony, neither Dr. Cohen nor Gargano ever prescribed medication for her symptoms.  (*Id.*)

In response to the ALJ's questioning about her daily activities, Plaintiff testified that she was able to shop, cook, and clean, and that, while she did not go out or socialize much, she did not have difficulty getting along with others.  (*Id.* at 49.)  She also stated that she was "nervous and stressed out," had a poor appetite, was unable to sleep well, and had "constant nightmares" about her false arrest.  (*Id.*)  Plaintiff further testified that she tried to meditate and to read in order to relieve her stress and anxiety, but had difficulty concentrating when reading.  (*Id.*) Plaintiff stated that the severity of her symptoms had not changed since the time of her false arrest.  (*Id.* at 50.)  When questioned as to whether she suffered any physical limitations in sitting, standing, walking, lifting, or carrying, Plaintiff answered in the negative and said that she was "physically healthy."  (*Id.*)

On September 26, 2013, the ALJ denied Plaintiff's application for SSI benefits (*id.* at 23-32), in a decision that is discussed in detail in Section II, *infra*.  Plaintiff requested that the Appeals Council review the ALJ's decision (*id.* at 20-22), and, on March 3, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (*id.* at 1-6).

### 3.   The Current Action and the Motions Before the Court

On May 5, 2015, Plaintiff, proceeding *pro se*, filed her Complaint in this action, alleging that the ALJ's decision "was erroneous, not supported by substantial evidence in the [R]ecord, and/or contrary to law."  (Complaint, dated May 5, 2015 ("Compl.") (Dkt. 2), ¶ 9.)

After requesting and receiving three extensions of time to answer or otherwise move against the Complaint (*see* Dkts. 9-14), Defendant filed an Answer on December 22, 2015, accompanied by a copy of the Record (*see* Dkts. 15-16).  On that same date, Defendant also filed a motion pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings (*see* Dkt. 17), and a memorandum of law in support of that motion (*see* Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, dated Dec. 22, 2015 ("Def. Mem.") (Dkt. 18)).

On January 8, 2016, Plaintiff filed her opposition to Defendant's motion for judgment on the pleadings, contending that the motion should be denied because her "medical documentation is sufficient in explaining the psychiatric symptoms that [she] suffer[ed] from that ke[pt] [her] from being employed."  (*See* Affirmation in Opposition to Motion, dated Jan. 7, 2016 ("Pl. Opp.") (Dkt. 20).)  Plaintiff filed no separate cross-motion, but, given this Court's obligation to construe *pro se* papers liberally to raise the strongest arguments they suggest, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (collecting authority), this Court construes Plaintiff's opposition as a cross-motion for judgment on the pleadings in her favor, pursuant to Rule 12(c), *see Houston v. Colvin*, No. 12cv03842 (NGG), 2014 WL 4416679, at *2 n.3 (E.D.N.Y. Sept. 8, 2014) (construing *pro se* Plaintiff's opposition to Defendant's motion for judgment on the pleadings as a cross-motion for judgment on the pleadings).  On

February 12, 2016, Defendant filed a letter stating that the Commissioner would not file a formal reply to Plaintiff's opposition.  (*See* Dkt. 21.)

## DISCUSSION

I.   **APPLICABLE LEGAL STANDARDS**

   A.   **Standard of Review**

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id*. (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ."  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971) (citation omitted).  In making this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Thus, if the correct legal principles have been applied, this Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

### B.  The Five-Step Sequential Evaluation

To be entitled to disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual is considered to be under a disability only if the individual's physical or mental impairments are of such severity that he or she is not only unable to do his or her previous work, but also cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits. *See* 20 C.F.R. § 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Throughout the inquiry, the ALJ must consider four primary sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities. *Id.* § 416.920(a)(4)(ii), (c). If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). *Id.* § 416.920(a)(4)(iii). If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience." *Id*.

Where the plaintiff alleges a mental impairment, steps two and three require the ALJ to apply a "special technique," outlined in 20 C.F.R. § 416.920a, to determine the severity of the claimant's impairment at step two, and to determine whether the impairment satisfies Social Security regulations at step three. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the claimant is found to have a "medically determinable mental impairment," the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)," then "rate the degree of functional limitation resulting from the impairment(s) in

17

accordance with paragraph (c) of [Section 416.920a]," which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.[10] 20 C.F.R. §§ 416.920a(b)(2), (c)(3); *see Kohler*, 546 F.3d at 265. The functional limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scale of "[n]one," "one or two," "three," or "four or more." 20 C.F.R. § 416.920a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's residual functional capacity ("RFC"), or ability to perform physical and mental work activities on a sustained basis. *Id.* § 416.945. The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work." *Id.* § 416.920(a)(4)(iv). Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy. *Id.* § 416.920(a)(4)(v), (g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim. *See Berry*, 675 F.2d at 467 (citation omitted). At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306

---

[10] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler*, 546 F.3d at 266 n.5).

(2d Cir. 2009); *see also Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).  The

Commissioner must establish that the alternative work "exists in significant numbers" in the

national economy and that the claimant can perform this work, given his or her RFC and

vocational factors.  20 C.F.R. § 416.960(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can

satisfy this burden by referring to the Medical-Vocational Guidelines, set out in 20 C.F.R.

Pt. 404, Subpt. P, App. 2 (the "Grids").  Where, however, the claimant suffers from

nonexertional impairments (such as mental impairments) that "'significantly limit the range of

work permitted by his [or her] exertional limitations,' the ALJ is required to consult with a

vocational expert," rather than rely exclusively on these published Grids.  *Zabala v. Astrue*,

595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986)

(citations omitted)).  "A nonexertional impairment 'significantly limit[s]' a claimant's range of

work when it causes an 'additional loss of work capacity beyond a negligible one or, in other

words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful

employment opportunity.'"  *Id*. at 410-11 (quoting *Bapp*, 802 F.2d at 605-06).

### C.   Duty To Develop the Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ

generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*,

77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d

751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v.*

*Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).  Where the claimant is unrepresented, "the ALJ is

under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore

for all the relevant facts.'"   *Echevarria*, 685 F.2d at 755 (quoting *Hankerson v. Harris*, 636 F.2d

893, 895 (2d Cir. 1980)).  The SSA regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will
> develop your complete medical history . . . [and] will make every
> reasonable effort to help you get medical reports from your own
> medical sources when you give us permission to request the
> reports. . . .  Every reasonable effort means that we will make an
> initial request for evidence from your medical source and, at any
> time between 10 and 20 calendar days after the initial request, if
> the evidence has not been received, we will make one followup
> request to obtain the medical evidence necessary to make a
> determination.

20 C.F.R. § 416.912(d), (d)(1).  The regulations further explain that a claimant's "complete

medical history" means the records of his or her "medical source(s)."  *Id.* § 416.912(d)(2).  If the

information obtained from medical sources is insufficient to make a disability determination, or

if the ALJ is unable to seek clarification from treating sources, the regulations also provide that

the ALJ should ask the claimant to attend one or more consultative evaluations.  20 C.F.R.

§§ 416.912(e), 416.917.

Where there are no "obvious gaps" in the record and where the ALJ already "possesses a

complete medical history," the ALJ is not "under an obligation to seek additional information in

advance of rejecting a benefits claim."  *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x

82, 84 (2d Cir. 2015) (summary order) (quoting *Rosa*, 168 F.3d at 79 n.5).

### D.   The Treating Physician Rule

The medical opinion of a treating source as to "the nature and severity of [a claimant's]

impairments" is entitled to "controlling weight," where the opinion is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2).  "[T]reating source"

is defined as the claimant's "own physician, psychologist, or other acceptable medical source

who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her.  20 C.F.R. § 416.902.[11]  Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. § 416.927(c); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).

Where an ALJ determines that a treating physician's opinion is not entitled to "controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion. 20 C.F.R. § 416.927(c)(2).  Failure to "give good reasons" is grounds for remand.  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of a treating physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS), 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing 20 C.F.R. § 416.927(d)(2)[12]), including:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including whether the treatment received was particular to the claimant's impairment; (3) the supportability of the physician's opinion; (4) the

---

[11] A medical source who has treated or evaluated the claimant "only a few times" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)."  20 C.F.R. § 416.902.

[12] On February 23, 2012, the Commissioner amended 20 C.F.R. § 416.927, by, among other things, removing paragraph (c), and redesignating paragraphs (d) through (f) as paragraphs (c) through (e).

consistency of the physician's opinion with the record as a whole; and (5) the specialization of the physician providing the opinion, 20 C.F.R. § 416.927(c)(2)-(5); *see Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (noting that these five factors "must be considered when the treating physician's opinion is not given controlling weight"); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 507 (S.D.N.Y. 2014) (citing *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)) (requiring an ALJ to "explicitly consider" the factors in order to "override the opinion of a treating physician").

Even where a treating physician's opinion is not entitled to "controlling weight," it is generally entitled to "more weight" than the opinions of non-treating and non-examining sources.  20 C.F.R. § 416.927(c)(2); *see* Social Security Ruling 96-2p (S.S.A. July 2, 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000).  A consultative physician's opinion, by contrast, is generally entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (internal quotation marks and citation omitted).  This is because consultative examinations "are often brief, are generally performed without benefit or review of the claimant's medical history, and, at best, only give a glimpse of the claimant on a single day.  Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citation omitted).

### E.   Assessment of a Claimant's Credibility

Assessment of a claimant's credibility with respect to subjective complaints about his or her symptoms or the effect of those symptoms on the claimant's ability to work involves a two-

step process.  Where a claimant complains that certain symptoms limit his or her capacity to

work, the ALJ is required, first, to determine whether the claimant suffers from a "medically

determinable impairment[] that could reasonably be expected to produce" the symptoms alleged.

20 C.F.R. § 416.929(c)(1).  Assuming the ALJ finds such an impairment, then the ALJ must take

the second step of evaluating the intensity and persistence of the claimant's symptoms.  *Id.*; *see*

*also Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010).  In doing so, the ALJ must

consider all of the available evidence, and must not "reject statements about the intensity and

persistence of pain and other symptoms 'solely because the available objective medical evidence

does not substantiate [the claimant's] statements.'"  *Cichocki v. Astrue*, 534 F. App'x 71, 76

(2d Cir. 2013) (quoting 20 C.F.R. § 416.929 (c)(1)).  Instead, where the claimant's contentions

regarding his or her symptoms are not substantiated by the objective medical evidence, the ALJ

must consider the other evidence and make a finding as to the claimant's credibility, in order to

determine the extent to which the claimant's symptoms affect his or her ability to do basic work

activities.  *Id.*; *see also Meadors*, 370 F. App'x at 183 (citing 20 C.F.R. § 404.1529(c)(3)(i)-

(vii)[13]); *Taylor v. Barnhart*, 83 F. App'x 347, 350-51 (2d Cir. 2003) (summary order); Social

Security Ruling ("SSR") SSR 96-7p (S.S.A. July 2, 1996).[14])

---

[13] Although the particular regulation cited in the *Meadors* decision does not apply to
SSI claims, a related regulation that does apply to such claims contains the same language.
*See* 20 C.F.R. § 416.929(c)(3)(i)-(vii).

[14] Effective on March 28, 2016, SSR 16-3p superseded SSR 96-7p.  *See* SSR 16-3p,
2016 WL 1237954 (Mar. 28, 2016).  The new ruling eliminates the use of the term "credibility"
from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is
not an examination of an individual's character."  *Id*. at *1.  Instead, adjudicators are instructed
to "consider all of the evidence in an individual's record when they evaluate the intensity and
persistence of symptoms after they find that the individual has a medically determinable
impairment(s) that could reasonably be expected to produce those symptoms."  *Id*. at *2.  Both
the two-step process for evaluating an individual's symptoms and the factors used to evaluate the
intensity, persistence and limiting effects of an individual's symptoms remain consistent between
the two rulings.  *Compare* SSR 96-7p *with* SSR 16-3p.  As the ALJ's decision in this matter was

"While an ALJ 'is required to take [a] claimant's reports of pain and other limitations into account' [in making a credibility determination] . . . he or she is 'not required to accept the claimant's subjective complaints without question.'" *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order) (quoting *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010)). "Rather, the ALJ may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id*. The ALJ must, however, include "specific reasons for [his or her] finding on credibility, supported by the evidence in the case record," and the reasons must make it sufficiently clear for a reviewer to determine "the weight the [ALJ] gave to the [claimant's] statements and the reasons for that weight." SSR 96-7p. The factors that an ALJ should consider in evaluating the claimant's credibility are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms. *See* 20 C.F.R. § 416.929(c)(3)(i)-(vii).

## II.    THE ALJ'S DECISION

On September 26, 2013, the ALJ issued a decision finding that Plaintiff had not been disabled since the filing date of her application for benefits. (*See generally* R. at 23-32.) In reaching this decision, the ALJ applied the five-step sequential evaluation procedure.

---

issued before the new regulation went into effect, this Court will review the ALJ's credibility assessment under the earlier regulation, SSR 96-7p.

**A.      Steps One Through Three of the Sequential Evaluation**

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity since July 5, 2012, the date that Plaintiff filed her application for SSI.  (*Id.* at 28.)

At step two, the ALJ determined that, during the period at issue, Plaintiff suffered from

the severe impairments of anxiety disorder and adjustment disorder, reasoning that these

impairments were severe because they "cause[d] more than minimal limitations in [Plaintiff's]

mental ability to do basic work related activities."  (*Id.*)

Although the ALJ found that Plaintiff's impairments were severe, he also determined, at

step three of the evaluation, that these impairments did not meet or medically equal any

impairment included in Listing 12.04 (affective disorders) of 20 C.F.R. Pt. 404, Subpt. P, App. 1.

(*Id.*)  Specifically, the ALJ found that the severity of Plaintiff's impairment did not satisfy the

"paragraph B" and "paragraph C" criteria under that listing.[15]  (*Id.*)  In evaluating the

---

[15] A claimant meets the listing for affective disorders (*i.e.*, Listing 12.04), where he or she
meets both the "paragraph A" and "paragraph B" criteria, or meets the "paragraph C" criteria.
     To meet the "paragraph A" criteria, a claimant would need to demonstrate "medically
documented persistence," of either "depressive syndrome" (characterized by at least four of nine
listed symptoms including, for example, anhedonia, sleep disturbance, decreased energy,
thoughts of suicide, and hallucinations), "manic syndrome" (characterized by at least three of
eight listed symptoms, including, for example, hyperactivity, flight of ideas, and easy
distractibility), or "bipolar syndrome" (manifested by the "full symptomatic picture" of both
manic and depressive syndromes).
     To meet the "paragraph B" criteria, a claimant would need to demonstrate at least two of
the following:  (1) marked restriction of activities of daily living; (2) marked difficulties in
maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence,
or pace; and (4) repeated episodes of decompensation, each of extended duration.
     To meet the "paragraph C" criteria, a claimant would need to demonstrate (1) a medically
documented history of chronic affective disorder of at least two years' duration causing more
than a minimal limitation of ability to do basic work activities, with symptoms or signs currently
attenuated by medication or psychosocial support, and (2) one of the following:  (a) repeated
episodes of decompensation, each of extended duration; (b) a residual disease process that has
resulted in such marginal adjustment that even a minimal increase in mental demands or a
change in the environment would be predicted to cause the individual to decompensate; or

"paragraph B" criteria, the ALJ first determined that Plaintiff had a "mild restriction" in her

activities of daily living.  (*Id.*)  In support of this finding, the ALJ relied upon Plaintiff's

statements to Dr. Belford, the consulting psychologist, in which Plaintiff indicated that she was

"able to dress, bathe, and groom herself independently, cook and prepare food, perform[] general

cleaning, do laundry, shop, manage money, drive, and take public transportation by herself."

(*Id*. at 28, 235.)  Next, the ALJ found that Plaintiff had "moderate difficulties" in social

functioning, although the ALJ did not explain this finding – once again citing only to Plaintiff's

statements to Dr. Belford, and specifically those statements that she was "generally a social

person" and maintained "sporadic contact" with her family members.  (*Id.* at 29.)  The ALJ also

cited to Dr. Belford's report in determining that Plaintiff had "moderate difficulties" with

concentration, persistence and pace, even though, as the ALJ noted, Dr. Belford had concluded

that Plaintiff had displayed only mildly impaired attention, concentration, and memory.  (*Id*.

at 29, 235.)  Finally, with respect to episodes of decompensation, the ALJ found that there was

no evidence that Plaintiff had experienced any such episodes of extended duration during the

relevant period.  (*Id.* at 29.)  The ALJ therefore concluded that, since Plaintiff's affective

disorder did not cause at least two "marked"[16] limitations or one "marked" limitation and

---

(3) current history of one or more years' inability to function outside a highly supportive living
arrangement, with an indication of continued need for such an arrangement.

[16] The definition of "marked" as it applies to measuring the degree of a limitation means
"more than moderate but less than extreme."  20 C.F.R. Pt. 404, Subpt. P, App. 1 Listing
12.00(C).

"repeated"[17] episodes of decompensation, each of extended duration, the "paragraph B" criteria were not satisfied.  (*Id.*)

The ALJ then reviewed the "paragraph C" criteria, finding that the medical evidence of record failed to establish that Plaintiff suffered from repeated episodes of decompensation, a residual disease process that would be predicted to cause the individual to decompensate upon minimal changes, or a history of inability to function outside a highly supportive living arrangement.  (*Id.*)  Based on all of these findings, the ALJ determined that Plaintiff did not meet Listing 12.04 for Affective Disorders.  (*Id.* at 28.)

Notably, although the ALJ determined in step two that Plaintiff's severe impairments included both adjustment disorder and anxiety disorder (*id.*), his analysis at step three considered only Listing 12.04, which relates to Affective Disorders (such as an adjustment disorder), but not Listing 12.06, which relates to Anxiety Disorders.  Despite this seeming oversight, however, the ALJ's analysis of Listing 12.04 also ruled out a finding that Plaintiff's anxiety disorder met or exceeded the criteria of Listing 12.06.  This is because the required "paragraph B" criteria are identical under both listings, and the "paragraph C" criteria under Listing 12.06 are similar in kind, but more stringent, than those required under Listing 12.04.  *See Padget v. Colvin*, No. 15cv3358 (GBD) (JCF), 2016 U.S. Dist. LEXIS 15852, at *21 n.18 (S.D.N.Y. Feb. 8, 2016) ("In ruling out an affective disorder, [the ALJ] also necessarily excluded an anxiety disorder because the required "paragraph B" or "paragraph C" criteria are the same for both conditions."), *report and recommendation adopted*, 2016 U.S. Dist. LEXIS 30292 (S.D.N.Y. Mar. 9, 2016); *compare* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.04(C) (requiring evidence of, *inter alia*,

---

[17] The definition of "repeated" as it applies to episodes of decompensation, each of extended duration, means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least two weeks."  20 C.F.R. Pt. 404, Subpt. P, App. 1 Listing 12.00(C)(4).

an "inability to function outside a highly supportive living arrangement"), *with id.* at Listing

12.06(C) (requiring evidence of a "complete inability to function independently outside the area

of one's home.").

### B.      The ALJ's Assessment of Plaintiff's RFC

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, finding that Plaintiff

had "the residual functional capacity to perform a full range of work at all exertional levels[,] but

with the following non-exertional limitations:  perform low stress job defined as one requiring

only simple decision making [and] no high volume production quotas."  (*Id.* at 29.)  In making

this finding, the ALJ stated that he had "considered all [of Plaintiff's] symptoms and the extent

to which these symptoms [could] reasonably be accepted as consistent with the objective medical

evidence and other evidence . . . ."  (*Id.*)  The ALJ then followed the two-step process used to

assess the credibility of a claimant's subjective accounts of her symptoms, first determining

whether Plaintiff had "underlying medically determinable physical or mental

impairment(s) . . . that could reasonably be expected to produce [her] pain or other symptoms"

(*id.* at 29-30), then proceeding to evaluate the "intensity, persistence, and limiting effects of

[Plaintiff's] symptoms to determine the extent to which they limit[ed] [her] functioning"

(*id.* at 30.  Upon conducting this analysis, the ALJ concluded that, while Plaintiff's medically

determinable impairment could reasonably be expected to cause her alleged symptoms of

depression and mood swings, Plaintiff's statements regarding the intensity, persistence, and

limiting effects of her symptoms were not entirely credible.  (*Id.*)

In reaching this conclusion, the ALJ began by noting that Plaintiff reported that she

suffered from significant emotional distress as a result of her false arrest, resulting in anxiety-

related symptoms including "dysphoric mood . . . excessive apprehension, irritability, and

intrusive thoughts." (*Id.*)  The ALJ further stated that Plaintiff reported having nightmares related to her false arrest up to three times a week.  (*Id.*)  The ALJ then proceeded to discuss the consultative opinion of Dr. Belford, who examined Plaintiff in August 2012, noting that Dr. Belford had diagnosed Plaintiff with anxiety disorder, but had found that this condition resulted in only mildly impaired attention, concentration, and memory.  (*Id.*)  Moreover, the ALJ noted that Dr. Belford had opined that, although Plaintiff could not adequately deal with stress, she could understand and follow simple instructions, perform simple tasks independently, maintain attention and concentration, keep a regular schedule, learn new tasks, make appropriate decisions, and relate adequately with others.  (*Id.*)  The ALJ stated that he gave "significant weight to the medical opinion[] of Dr. Belford since it reflect[ed] [Plaintiff's] actual level of psychological functioning."  (*Id.*)

By contrast, the ALJ gave "little weight" to the medical opinion of Plaintiff's treating sources at MCMH.  (*Id.*)  The ALJ noted that the treatment notes from MCMH confirmed the diagnosis of adjustment disorder arising from Plaintiff's false arrest, and that Plaintiff's treaters had indicated up through January 2013 that Plaintiff would be "unable to maintain steady employment" (*id.*), but he apparently chose not to credit this expressed medical opinion, without evaluating any specific factors or explaining his reasoning.  Instead, the ALJ stated simply that he assigned little weight to the opinions of the treating sources at MCMH and found that Plaintiff's "degree of anxiety and depression was exaggerated."  (*Id.*)  Based on this analysis of the medical evidence of record, the ALJ concluded "that limited medical evidence in the [R]ecord support[ed]" his assessment of Plaintiff's residual functional capacity, that Plaintiff's allegations were not fully credible, and that her symptoms did not significantly limit her ability to perform basic work-related activities.  (*Id.* at 30-31.)

### C.      Steps Four and Five of the Sequential Evaluation

At step four of the sequential evaluation, the ALJ found, based on the assessed RFC, that Plaintiff was capable of performing her past work as a foster-care case worker, as that occupation is actually and generally performed.  (*Id.* at 31.)  The ALJ noted that Plaintiff's limitation to a low-stress job requiring only simple decision making and no high-volume production quotas did not preclude her from employment as a foster-care case worker.  (*Id.*)

Although he determined at step four that Plaintiff could perform her past relevant work, the ALJ nevertheless proceeded to the fifth step of the sequential evaluation.  (*Id.*)  At step five, the ALJ concluded, based on Plaintiff's RFC, age,[18] education, and work experience, that she was able to perform jobs existing in significant numbers in the national economy.  (*Id.*)  In making this determination, the ALJ followed the framework of section 204.00 of the Grids (discussing evaluation of disability where the claimant retains the capacity to perform heavy work (or very heavy work))[19] to conclude that Plaintiff was not disabled.[20]  (*Id.* at 31-32.)  The

---

[18] Although the ALJ noted that Plaintiff was 51 years old on the date her application was filed, he incorrectly placed Plaintiff in the "younger individual" age category of 18-49, rather than the "person closely approaching advanced age" category of 50-54 (R. at 31; *see also* 20 C.F.R. § 416.963(e)).  This error, however, does not appear to have affected the ALJ's ultimate determination that Plaintiff was not disabled.

[19] Under this section, a person's RFC to perform heavy or very heavy work includes the RFC "for work at the lesser functional levels as well, and represents substantial work capability for jobs in the national economy at all skill and physical demand levels."  20 C.F.R. Pt. 404, Subpt. P, App. 2 § 204.00.  Thus, the Grids dictate that "an impairment which does not preclude heavy work (or very heavy work) would not ordinarily be the primary reason for unemployment, and generally is sufficient for a finding of not disabled."  *Id*.  Further, under the relevant regulations, heavy work is defined as that which "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds," 20 C.F.R. § 416.967(d), and very heavy work is defined as that which "involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more," 20 C.F.R. § 416.967(e).

[20] The ALJ relied solely on the Grids and did not consult a vocational expert to determine whether Plaintiff could perform other jobs that existed in significant numbers in the national

ALJ stated that, although Plaintiff's ability to perform work at all exertional levels was compromised by nonexertional limitations, "these limitations ha[d] little or no effect on the occupational base of unskilled work[21] at all exertional levels." (*Id.* at 32.) He added that Plaintiff's limitation to low stress jobs requiring only simple decision-making and no high volume production quotas had only a "slight effect" on the available occupational base. (*Id.*)

## III.   REVIEW OF THE ALJ'S DECISION

On its motion for judgment on the pleadings, Defendant argues that the ALJ's decision should be upheld because the determination that Plaintiff was not disabled during the relevant period is supported by substantial evidence. (*See* Def. Mem., at 1.) In opposition, Plaintiff contends that her medical documentation sufficiently explains the psychiatric symptoms that kept her from being employed during the relevant period. (*See* Pl. Opp.) As the ALJ used the applicable five-step evaluation in analyzing Plaintiff's claim, the questions before this Court are whether, in evaluating Plaintiff's claim under this accepted protocol, the ALJ made any errors of law that might have affected the disposition of the case, and whether his determination that Plaintiff was not disabled was supported by substantial evidence.

---

economy. If the ALJ's determination that Plaintiff's nonexertional limitations did not significantly limit the range of work that Plaintiff was able to perform (R. at 32) were to be accepted, then his sole reliance on the Grids in this case would not constitute legal error, *see Zabala*, 595 F.3d at 410 (noting that an ALJ is required to consult a vocational expert where the claimant's nonexertional limitations "significantly limit the range of work permitted by his exertional limitations," but not where they cause only a negligible loss of work capacity) (quoting *Bapp*, 802 F.2d at 604-05 (citations omitted)).

[21] "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15.

### A.   <u>Lack of Attempt To Develop the Record</u>

In arguing that the ALJ weighed the opinions of Plaintiff's treating sources properly

when assessing Plaintiff's RFC, Defendant contends that those opinions constituted "blanket

statements of disability" that need not have been credited with "any special significance."

(*See* Def. Mem., at 14-15.)  Although this Court agrees that such generalized statements need not

be credited when analyzing a claimant's RFC, the Court also finds that the ALJ committed legal

error when he failed even to request that Plaintiff's treaters provide medical source statements

specifically addressing Plaintiff's work-related limitations.

As stated above, *see* Section I(C), *supra*, an ALJ has an affirmative duty to develop the

administrative record, which the ALJ discharges by obtaining a "complete medical history."

20 C.F.R. § 416.912(d); *see also Echevarria*, 685 F.2d at 755 (noting that the duty to develop the

record is "heightened" where, as was the case here, the claimant is unrepresented).  Under

SSA regulations, this duty also requires the ALJ to request a statement from the plaintiff's

treating source explaining "how [the] plaintiff's impairments affect his or her ability to perform

work-related activities."  *Johnson v. Astrue*, 811 F. Supp. 2d 618, 629 (E.D.N.Y. 2011) (citing

20 C.F.R. § 404.1513(b)(6)).  While the absence of such a statement will not necessarily render

the record incomplete, "the regulations . . . provide that the Commissioner will . . . request such a

statement," and the failure to do so constitutes legal error.  *Id.*; *see also Perez*, 77 F.3d at 47

("[B]efore we make a determination that you are not disabled, we will develop your complete

medical history . . . [and] will make every reasonable effort to help you get medical reports from

your own medical sources when you give us permission to request the reports." (quoting

20 C.F.R. § 404.1512(d))); *Robins v. Astrue*, No. 10cv3281 (FB), 2011 WL 2446371, at *3

(E.D.N.Y. June 15, 2011) ("Although the regulation provides that the lack of such a statement

will not render a report incomplete, it nevertheless promises that the Commissioner will request one."). Even so, the Second Circuit has held that "remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).

Here, the ALJ determined Plaintiff's RFC solely by looking to the consultative opinion of Dr. Belford. In this regard, the ALJ mentioned only Dr. Belford's opinion when discussing Plaintiff's ability to follow and understand directions and instructions, perform and learn simple or complex tasks, maintain attention and concentration, keep a regular schedule, make appropriate decisions, and relate adequately with others. (R. at 30.) The ALJ's brief mention of the medical records from Plaintiff's treating sources at MCMH does not indicate that the ALJ reviewed any evidence from those sources in considering how Plaintiff's mental limitations impacted her ability to perform work-related functions. *See Pabon v. Barnhart*, 273 F. Supp. 2d 506, 516 (S.D.N.Y. 2003) (noting that a claimant's mental RFC "must be expressed in terms of work-related functions," such as "understanding, carrying out, and remembering instructions; using judgment in making work-related decisions; responding appropriately to supervision, co-workers and work situation[s]; and dealing with changes in a routine work setting." (quoting SSR 96-9p)).

Presumably, the reason for this one-sided recitation of Plaintiff's work-related limitations is that the only statement in the Record specifically describing how Plaintiff's mental limitations affected her capacity to perform employment-related tasks came from Dr. Belford.[22] Where a

---

[22] Although the Record contains several letters indicating that Dr. Cohen and Gargana believed that Plaintiff "may have" had difficulty maintaining steady employment at the time of each letter (R. at 15, 178-79, 216-18, 227, 248-49, 258), Defendant correctly notes that such

medical source statement from a claimant's treating source is absent from the record, however, an ALJ is not permitted to rely only on treatment records and opinions from consultative sources; instead, he must at least request the treating source's statement. *See Dickson v. Astrue*, No. 1:06-CV-0511 NAM/GHL, 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) ("In this case, the administrative transcript does not contain any statements from any of plaintiff's treating sources regarding how plaintiff's impairments affect her ability to perform work-related activities. The ALJ had nothing more than treatment records . . . and consultative reports to review. Thus, the ALJ had an affirmative duty . . . to develop the medical record and request that plaintiff's treating physicians assess plaintiff's functional capacity."); *see also Baron v. Astrue*, No. 11cv4262 (JGK) (MHD), 2013 WL 1245455, at *25 (S.D.N.Y. Mar. 4, 2013) ("[T]he Commissioner should request [a medical source statement] from a claimant's treating physician if one is not provided, even if the claimant's medical history is otherwise complete."), *report and recommendation adopted*, 2013 WL 1364138 (Mar. 26, 2013). As the Record in this case contains no indication that the ALJ ever sought such statements from Plaintiff's treaters, and instead suggests that the ALJ merely relied on the treaters' generalized opinions without requesting more specific information, this Court finds that the ALJ did not satisfy his duty to develop the record.

Moreover, this is not a case where the extensive amount of other evidence in the record renders harmless the ALJ's failure to request a treating source's medical report. Although the Record includes a complete history of Plaintiff's medical treatment, the Record is not so

---

"unspecific observation[s]," stated in terms of "possibility," rather than "reasonably-certain medical probability," do not provide a basis for determining a claimant's RFC, *Younes v. Colvin*, No. 14-CV-170 (DNH) (ESH), 2015 WL 1524417, at *9 (N.D.N.Y. Mar. 13, 2015), *report and recommendation adopted*, 2015 WL 1524417 (Apr. 2, 2015).

voluminous or detailed as to remove any doubt regarding the work-related effects of Plaintiff's mental limitations. Further, the conflict between the medical source statement of Dr. Belford, which contains his opinion that Plaintiff's functional capacity was not substantially limited, and the general opinions stated in the letters from Dr. Cohen and Gargana, which assert that Plaintiff was not capable of maintaining steady employment, indicate that medical source statements from Plaintiff's treaters are necessary to enable a proper weighing of the medical opinions of record, as those opinions relate to Plaintiff's RFC. Given that the Record does not contain other evidence sufficient to support the ALJ's determination of Plaintiff's RFC, the ALJ's failure to request a medical source statement from the treating sources at MCMH is an error that requires remand.

### B.   Improper Application of the Treating Physician Rule

Remand is also required because the ALJ applied the treating physician rule improperly when he decided to accord only "little weight" to the opinions of Plaintiff's treating sources at MCMH, without considering all of the necessary factors. As set out in Section I(D), *supra*, the ALJ must apply a series of factors, which are listed in 20 C.F.R. § 416.927(c), before determining to give less than controlling weight to a treating source's opinion. The ALJ's consideration of these five factors "must be transparent, [as] the regulations state that the Commissioner 'will always give good reasons . . . for the weight [it] give[s] . . . [a] treating source's opinion.'" *Hidalgo v. Colvin*, No. 12cv9009 (LTS) (SN), 2014 WL2884018, at *15 (S.D.N.Y. June 25, 2014) (adopting report and recommendation and quoting 20 C.F.R. § 404.1527(c)(2)). Moreover, even if inconsistent with other substantial evidence, and thus not entitled to controlling weight, a treating physician's opinion is generally entitled to "more

weight" than the opinions of non-treating and non-examining sources.  *See* 20 C.F.R.

§§ 416.927(c)(1), (2); *see also Gonzalez*, 113 F. Supp. 2d at 589.

In this case, in weighing the medical opinions of record, the ALJ gave "significant

weight" to the opinion of Dr. Belford, a consultative examiner, on the basis that his opinion

"reflect[ed] the claimant's actual level of psychological functioning."  (R. at 30.)  By contrast, in

weighing the opinions of Plaintiff's treating sources at MCMH, the ALJ stated:

> Treatment notes from [MCMH] confirm the diagnosis of
> adjustment disorder due to psychological symptoms following
> false arrest in 2009.  [They] indicate[d] in January 2013 that the
> claimant [was] unable to maintain steady employment.  The
> undersigned gives little weight to the medical opinion of treating
> sources at Metropolitan Center and finds that the claimant's degree
> of anxiety and depression was exaggerated.

(*Id*.)  The ALJ's decision does not reflect that he evaluated any of the relevant factors in

determining the weight to accord to the treating sources' opinions, and, in fact, provides no

reasons at all for his decision to assign only "little weight" to the opinions of Plaintiff's therapists

at MCMH.[23]  Instead, the ALJ appears to have based this decision on a conclusory determination

that Dr. Belford's consultative opinion "reflected [Plaintiff's] actual level of psychological

functioning," while the opinions of Plaintiff's treating sources did not (R. at 30.) – a

determination that cannot permissibly be reached without a transparent evaluation of the

necessary factors.  This failure to "give good reasons" explaining why the opinion of Plaintiff's

treating source was not entitled to controlling weight, or why it was entitled to less weight than

the consultative opinion of Dr. Belford, is a ground for remand.  *See Halloran*, 632 F.3d at 33.

---

[23] As discussed above, *see* Section III(A), *supra*, the ALJ's failure to develop the Record
by requesting a medical source statement from Plaintiff's treating sources may have negatively
affected his ability to evaluate the medical evidence and opinions from those sources.

Moreover, to the extent the ALJ believed, as suggested by his decision, that the opinions of any of Plaintiff's treating physicians were "insufficiently explained, lacking in support, or inconsistent with the physician's other reports," the ALJ was required to "seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 504 (S.D.N.Y. 2014) (quoting *Correale–Englehart v. Astrue,* 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010)).  As discussed above, this was part of the ALJ's affirmative duty to develop the record.  *See Geronimo v. Colvin*, No. 13cv08263 (ALC), 2015 WL 736150, at *5 (S.D.N.Y. Feb. 20, 2015); *Ocasio v. Barnhart*, No. 00cv6277 (SJ), 2002 WL 485691, at *8 (E.D.N.Y. Mar. 28, 2002).

Accordingly, I recommend that this case be remanded, so that the ALJ can reevaluate the treating opinions of record, in accordance with the treating physician rule, and provide adequate reasons for the weight he assigns to those opinions.  To the extent that the ALJ determines that the opinions of Plaintiff's treating sources are not supported by, or are inconsistent with, their clinical notes, the ALJ should seek clarification of that issue by further developing the Record.

C.      **Inadequate Assessment of Plaintiff's Credibility**

Given that the Record contained conflicting evidence about the severity of Plaintiff's symptoms, the ALJ was required to make credibility findings.  *See Snell v. Astrue*, 177 F.3d 128, 135 (2d Cir. 1999).  In making such findings, the ALJ followed the applicable two-step process, in that he first determined that Plaintiff did indeed have a medically determinable impairment that could reasonably be expected to produce her symptoms, and then proceeded to evaluate Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms.  (R. at 29-30.)  Ultimately, the ALJ found that Plaintiff had the severe impairments of anxiety disorder and adjustment disorder, but also determined that Plaintiff's subjective

37

statements regarding the symptoms caused by those impairments were "not entirely credible." (*Id*. at 30.)

Apart from applying this two-step framework for credibility assessment, however, an ALJ must also consider a number of factors when evaluating whether a claimant's reported symptoms are consistent with the objective medical evidence of record, as well as the extent to which those symptoms limit the claimant's ability to work.  *See Meadors*, 370 F. App'x at 184 n.1.  As noted in Section I(E), *supra*, these factors include:  (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms.  *See* 20 C.F.R. § 416.929(c)(3)(i)-(vii).

Although the ALJ discussed Plaintiff's symptoms (including dysphoric mood, excessive apprehension, irritability, intrusive thoughts, and frequent nightmares), and evaluated these symptoms in light of the objective medical evidence of record, the ALJ failed to consider the necessary credibility factors.  For instance, the ALJ did not discuss Plaintiff's usual daily activities, the precipitating and aggravating factors that triggered her symptoms, or the measures she took to relieve her symptoms, despite the fact that Plaintiff had specifically addressed those subjects, either in her testimony at the administrative hearing or in the function report she submitted to the SSA.  (*See* R. at 49, 143, 145-47, 150.)  The ALJ's failure to consider these factors explicitly when evaluating the nonmedical evidence relevant to Plaintiff's subjective accounts of her symptoms constitutes legal error and is cause for remand.  *See Chase v. Astrue*,

No. 11-CV-0012 (RRM), 2012 WL 2501028, at *13 (E.D.N.Y. June 28, 2012) (holding that the

case should be remanded because the ALJ did not explicitly refer to the credibility factors nor

discuss any of them beyond listing the plaintiff's daily activities); *see also Cabassa v. Astrue*,

No. 11-CV-1449 (KAM), 2012 WL 2202951, at *14 (E.D.N.Y. June 13, 2012) ("[T]he ALJ

erred by not explicitly addressing the factors enumerated in 20 C.F.R. §§ 404.1529(c)(3),

416.929(c)(3) and by failing to give specific reasons for his credibility determination based on

those factors."); *Sanchez v. Colvin*, No. 13-CV-0929 (MKB), 2014 WL 4065091, at *15

(E.D.N.Y. Aug. 14, 2014) ("[T]he ALJ's failure to consider all of the factors he was required to

consider in making a credibility determination of Plaintiff's contentions of pain is legal error and

cause for remand.").  Upon remand, the ALJ should consider the required factors when assessing

Plaintiff's credibility as to her subjective accounts of her symptoms.

### D.    Sole Reliance on the Grids

Finally, this Court notes that if, upon remand (with the further development of the

Record, a proper application of the treating physician rule, and the required credibility

assessment), the ALJ were to determine that Plaintiff's mental impairments significantly limit

the range of work that she could otherwise perform, then the ALJ should obtain testimony from a

vocational expert, rather than base a disability determination solely on the Grids.  *See Zabala*,

595 F.3d at 410 ("If a claimant has nonexertional limitations that 'significantly limit the range of

work permitted by his exertional limitations,' the ALJ is required to consult with a vocational

expert." (quoting *Bapp*, 802 F.2d at 605)); *see also* n.20, *supra*.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that Defendant's motion for

judgment on the pleadings affirming the decision of the Commissioner (Dkt. 17) be denied, that

Plaintiff's cross-motion for judgment on the pleadings (Dkt. 20) be granted, and that this case be remanded to the SSA, with instructions that the ALJ:

1. seek to develop the Record by obtaining medical source statements detailing how Plaintiff's mental impairments affect her ability to perform work-related activities,

2. properly weigh the opinions of Plaintiff's treating sources and set out good reasons for any determination that such opinions are not entitled to controlling weight,

3. make a determination of Plaintiff's credibility that explicitly takes into account the relevant factors, and

4. obtain the testimony of a vocational expert, should a re-evaluation of the evidence in light of the above lead to the conclusion that Plaintiff's mental impairments significantly limit the range of work that, based on her exertional capabilities, she would otherwise be able to perform.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan, United States Courthouse, 40 Foley Square, Room 2104, New York, NY 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, NY 10007.  Any requests for an extension of time for filing objections should be directed to Judge Sullivan.  As Plaintiff is proceeding in this action *pro se*, any submissions she makes to the Court (including any objections to this Report and Recommendation for filing, any courtesy copies for judges' chambers, and any requests for extensions of time) should be mailed or otherwise delivered by her to the Court's *Pro Se* Office.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN

A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See*

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d

Cir. 1983).

Dated:  New York, New York
         August 29, 2016

                                        Respectfully submitted,


                                        _____
                                        DEBRA FREEMAN
                                        United States Magistrate Judge

Copies to:

Hon. Richard J. Sullivan, U.S.D.J.

Ms. Leslie Maria Meilleur
421 West 162nd Street, Apt. J
New York, NY 10032

Counsel for Defendant (via ECF)